IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | No. 4:18-cr-00216-DCC |
| | ) | |
| v. | ) | |
| | ) | **OPINION AND ORDER** |
| Joseph Leslie Griggs. | ) | |
| _____ | ) | |

This matter comes before the Court on Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF No. 82.

## BACKGROUND

In February 2018, the Grand Jury returned a one-count Indictment, which alleged "[t]hat on or about June 28, 2017, in the District of South Carolina, the [D]efendant . . . having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess in and affecting commerce, firearms and ammunition, all of which had been shipped and transported in interstate commerce." ECF No. 2. Specifically, on June 28, 2017, officers with the Darlington County, South Carolina Sheriff's Office executed a state search warrant at Defendant's residence after receiving reports of stolen property being in plain view at Defendant's residence. Officers located the following items outside of Defendant's residence, which were found to be stolen: enclosed trailers, riding lawn mowers, four-wheelers, utility trailers, commercial equipment pieces, lawn equipment, chain saws, weed eaters, new tools in boxes, and generators. After searching the interior of Defendant's residence, officers located marijuana, oxycodone, hydrocodone, alprazolam,[1] a large quantity of ammunition, and a total of

_____

[1] It appears that some, or all, of the seized prescription medications may have been legally prescribed to Defendant; however, the Court is not aware of any documentation in the record that Defendant was prescribed hydrocodone or alprazolam at the time of his arrest. Defendant denied being involved in the distribution of drugs.

twenty-four firearms, <u>five of which were found to be stolen</u>.[2]  Law enforcement discovered the five stolen firearms were stolen during five separate burglaries, though there is no evidence Defendant was involved in the burglaries.

Defendant arrived at his home during the execution of the search warrant, waived his *Miranda*[3] rights, and spoke to law enforcement.  Defendant informed officers that he bought several of the stolen items from two individuals.  On June 30, 2017, Defendant again spoke with law enforcement and admitted that he had knowledge of one of the firearms being stolen.  However, Defendant would not identify the individual from whom he purchased the firearm, <u>because the individual was a juvenile at the time of the transaction</u>.  Defendant was charged with eleven state crimes related to controlled substance possession and receiving stolen goods.  Defendant paid a fine for Possession of 28 Grams or Less of Marijuana or 10 Grams or Less of Hash, First Offense in the Darlington County, South Carolina Magistrate Court, and the remaining state charges were nolle prossed.

On March 20, 2018, Defendant was arrested for the instant federal offense and was arraigned before United States Magistrate Judge Thomas E. Rogers, Jr.  ECF Nos. 7, 9.  The Government did not oppose bond, and the Court set a $50,000 unsecured bond with home detention and location monitoring.  ECF No. 13.  On November 13, 2018, after five continuances, Defendant pled guilty to Count 1 of the Indictment without a written plea agreement.  ECF Nos. 49, 50.

Following the plea hearing, the United States Probation Office ("USPO") prepared a Presentence Report ("PSR"), which was disclosed to the Court on February 4, 2019.  The PSR outlined Defendant's criminal history: On October 18, 1991, Defendant was arrested for three

---

[2] Some of the remaining firearms were owned by Defendant's family members.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

counts of Grand Larceny; two counts of Burglary, Third Degree; and one count of Burglary, Second Degree. Three days later, Defendant was arrested for two counts of Grand Larceny; two counts of Burglary, Third Degree; one count of Petit Larceny; and one count of Driving Without a License. These charges related to the theft of a various items—including an outboard boat motor, weed eaters, lawn mowers, riding lawn mowers, mower deck, grass edger, fishing rods and reels, tool box, air compressor, motor, chain saw, saw, pocket knives, camcorder, tripod, cash, and amp meters—from four individuals, a hardware store, and a church. Although the disposition of the Petit Larceny and Driving Without a License charges is unknown, Defendant was convicted and sentenced on the remaining ten charges on March 17, 1992. Defendant was sentenced to ten years' incarceration on the Grand Larceny and Burglary, Second Degree charges, to run concurrently with five years' incarceration on the Burglary, Third Degree charges. Despite Defendant's lengthy prison sentence, he was released to parole on December 1, 1993, having served less than twenty-one months in prison. Defendant's parole expired on July 9, 2000.

Based on Defendant's criminal history and offense conduct, the PSR established a criminal history category of I and a total offense level of 17. This resulted in a sentencing guideline range of 24 to 30 months' imprisonment with 1 to 3 years' supervised release. After reviewing the PSR, the Court scheduled Defendant's sentencing for July 11, 2019. On July 3, 2019, prior to sentencing, the Court entered a Text Order, which stated: "Given the large number of firearms involved in this case—several of which were stolen—as well as the remaining nature and circumstances of the offense, the Court is considering varying upward from the Guidelines Range of 24-30 Months' incarceration."[4] ECF No. 60. The Text Order further noted: "Given the

---

[4] As the Text Order noted, the Court was under no legal obligation to inform Defendant that it was considering an upward variance; instead, the Court informed all parties as a courtesy.

age of this case, the Court will not continue the sentencing hearing absent extraordinary circumstances." ECF No. 60.

Despite the Court's admonition that a continuance would not be granted absent extraordinary circumstances, Defendant filed a Motion to Continue Sentencing on July 9, 2019—a mere two days before the sentencing hearing. ECF No. 62. The Motion stated that the Court's Text Order regarding a potential upward variance "caught the defense completely off guard as [Defendant] was hoping to receive a downward variance due to his age, his deteriorating health, and the fact that his predicate conviction is 28 years old." Additionally, Defendant noted the Supreme Court of the United States' then-recent decision in *Rehaif v. United States*,[5] and indicated a need "to research this further and order the plea transcript to determine its applicability."[6] ECF No. 62. Later that day, the Court entered a Text Order, which outlined the unnecessarily lengthy nature of the case and emphasized that a potential upward variance should not have been surprising given the number of firearms. ECF No. 63. Nonetheless, because Defendant "invoked the applicability of *Rehaif* and intimated that he might seek to withdraw his plea, the Court [found] it appropriate to hear from the parties on [the] issue." *Id.* After hearing arguments from the parties on July 11, 2019, the Court granted the Motion to Continue and set the case for sentencing on August 23, 2019. ECF No. 64. Alternatively, the Court set a jury selection date of September 3, 2019, in the event Defendant moved to withdraw his guilty plea based on *Rehaif.  Id.*

---

[5] 139 S. Ct. 2191 (2019).

[6]

 This was the first time that Defendant raised the *Rehaif* issue, tacitly acknowledging that it was only raised because of the potential upward variance. *See* ECF No. 62.

On August 9, 2019, Defendant filed a Motion for Downward Departure or Variance, requesting a noncustodial sentence based primarily on his age, medical conditions, and need for controlled substance prescriptions. ECF No. 68. Alternatively, Defendant requested that he be allowed to self-surrender to a Bureau of Prisons ("BOP") medical facility. *Id.* The Government filed a Response in Opposition. ECF No. 70. On August 23, 2019, nearly eighteen months after the Indictment in this case, the Court denied Defendant's Motion for Downward Departure or Variance and sentenced Defendant to a guidelines sentence of twenty-five months' incarceration and three years of supervised release. ECF No. 74. Additionally, the Court recommended that Defendant be placed at the Federal Medical Center in Butner, North Carolina ("FMC Butner"). *Id.*

On May 6, 2020, Defendant filed a Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) based on the COVID-19 pandemic. ECF No. 82. The Government filed a Response in Opposition on May 13, 2020, and Defendant filed a Reply on May 14, 2020. ECF Nos. 84, 85. Less than one week later, Defendant filed a Supplemental Reply, without leave of Court, which "ask[ed] the Court for its expedited consideration of the Motion." ECF No. 86. The Court turns now to the law applicable to Defendant's Motion.

## APPLICABLE LAW

"Before Congress passed the First Step Act, only BOP could move the Court for compassionate release of an incarcerated defendant for 'extraordinary and compelling reasons' under 18 U.S.C. § 3582(c)(1)(A)(i)." *United States v. Edwards*, No. 6:17-cr-0003, 2020 WL 1650406, at *3 (W.D. Va. April 2, 2020). With the passage of the First Step Act, Congress has now empowered inmates to move for compassionate release after they have exhausted their administrative remedies by requesting that BOP file a motion on their behalf. *Id.* Specifically,

the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act,

now provides in pertinent part:

> **(c) Modification of an imposed term of imprisonment.**--The Court may not modify a term of imprisonment once it has been imposed except that--
>
> (1) in any case--
>
> > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> > > (i) extraordinary and compelling reasons warrant such a reduction
> > >
> > > . . .
> > >
> > > > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582.   "A defendant who seeks compassionate release under § 3582(c)(1)(A)(i) has

the burden of establishing that such relief is warranted."  *Edwards*, 2020 WL 1650406, at *3

(citations omitted).

The United States Sentencing Guidelines do not specifically contain a policy statement

that addresses motions for reductions in terms of imprisonment that are <u>filed by an inmate</u>.

However, U.S.S.G. § 1B1.13 ("the Policy Statement") addresses motions for reductions in terms

of imprisonment that are <u>filed by the Director of the Bureau of Prisons</u>.  The Policy Statement

largely mirrors the language of 18 U.S.C. § 3582(c)(1)(A) but includes a directive that the court

determine that "the defendant is not a danger to the safety of any other person or to the

6

community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).  In determining whether a defendant is a danger to the safety of any other person or to the community, the Court must consider the following statutory factors:

> **(1)** the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> **(2)** the weight of the evidence against the [defendant];
>
> **(3)** the history and characteristics of the person, including—
>
>> **(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> **(B)** whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> **(4)** the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Assuming the Court finds that the defendant is not a danger to the safety of any other person or the community, the Policy Statement directs the Court to consider a variety of circumstances in determining whether extraordinary and compelling reasons justify a sentence reduction.  U.S.S.G. § 1B1.13(2) App. Note 1.  Specifically, the Court should consider whether any of the following circumstances exist: (1) "[t]he defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," although a specific prognosis of life expectancy is not required; (2) the defendant is: "suffering from a serious physical or medical condition, suffering from a serious functional or cognitive impairment, or experiencing deteriorating physical or mental health because of the aging process, that substantially

diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; (3) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; (4) "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children"; (5) "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner"; or (6) "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons" set forth in the prior factors. *Id.* (internal numbering omitted).

Importantly, the Policy Statement and Application Notes set forth above <u>only</u> apply to motions filed by the Director of the BOP. *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019). "The Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted, nor has it adopted a new policy statement applicable to motions filed by defendants." *Id.* (internal citation omitted) (footnote omitted). Therefore, "[w]hile the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentencing reduction under § 3582(c)(1)(A)(i)." *Id.* Indeed, "[a]n interpretation of the old policy statement as binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role." *Id.* (citation omitted). "It is also inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when [BOP] finds they are not appropriate." *Id.* (citations omitted). "Thus, courts may, on motions by defendants, consider whether a sentence

reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement." *Id.* at 579–80.  Ultimately, determination of whether extraordinary and compelling reasons exist in a particular case is a question committed to the sound discretion of the district court.  *See id.*

## DISCUSSION

### I.  Exhaustion of Administrative Remedies

The parties agree that Defendant filed an Inmate Request to Staff on April 13, 2020, in which Defendant requested "a reduction in sentence based on Terminal Medical Condition under COVID-19."  ECF No. 82-1 at 1.  On April 24, 2020, the BOP responded that Defendant "do[es] not have medical conditions under debilitated medical conditions, elderly with medical conditions, or terminal medical condition."  *Id.*  Accordingly, the Government acknowledges that Defendant has exhausted his administrative remedies.  *See* ECF No. 84 at 6 ("While Defendant filed his motion before the lapse of 30 days from the date he submitted his request to the BOP, the 30 days will have passed starting May 14, 2020.  The Government therefore submits that following the date of this filing, the Court has jurisdiction to consider the merits of Defendant's motion for a sentence reduction.").  The Court agrees with the parties that Defendant has properly exhausted his administrative remedies; therefore, the questions before the Court is whether Defendant presents extraordinary and compelling reasons justifying a sentence reduction.

### II.  Extraordinary and Compelling Reasons

Defendant contends that his extensive medical conditions provide extraordinary and compelling reasons for a sentence reduction.  By way of background, Defendant is a 54-year-old

man who was 5' 9" tall and weighed 205 pounds[7] at the time of his sentencing.  The PSR states that Defendant suffers from extensive medical conditions, including spinal stenosis, degenerative disc disease, a narrow spinal canal, conjoined nerves at the lumbar of his back, sciatica nerve pain, high cholesterol, high blood pressure, Chronic Obstructive Pulmonary Disease ("COPD"), diabetes, anxiety, and depression.  Prior to being incarcerated in the BOP, Defendant was prescribed Oxycodone/Acetaminophen 10-325 mg four times per day for pain, 600 mg of Gabapentin three times per day for nerve pain, 10 mg of Flexeril three times per day for muscle relaxation, 1 mg of Klonopin three times per day for muscle spasms and anxiety, 20 mg of Oxycontin three times per day for pain, 20 mg of Lipitor once per day for high cholesterol, Atenolol-Chlorthalidone 50/25 mg once per day for high blood pressure, 81 mg of Aspirin per day, 500 mg of Metformin twice per day for diabetes, 90 micrograms of Pro-Air HFA twice per day for COPD, a 62.5 mg Anoro inhaler twice per day for COPD, and 60 mg of Cymbalta once per day for anxiety and depression.

At sentencing, the Court gave serious weight to Defendant's extensive medical conditions and sentenced Defendant to a guidelines sentence of twenty-five-months' incarceration. Additionally, the Court recommended that Defendant be placed at FMC Butner.  Defendant was designated to report to Federal Correctional Institution ("FCI") Butner Low and self-surrendered on October 8, 2019.  Defendant's projected release date is June 4, 2021.  As of the date of this Order, Defendant has served 227 days in custody, which is approximately 37.5% of his projected sentence rather than the 50% that Defendant claims he has served.  *See* ECF No. 82 at 2 ("Mr. Griggs is approximately half-way into a 2-year prison term for being a felon in possession of a weapon.").

---

[7] This height and weight combination results in a BMI of 30.3, which classifies Defendant as borderline clinically obese.

The BOP reports that, as of May 21, 2020, FCI Butner Low has 76 confirmed active cases of COVID-19 among inmates and two confirmed active cases among staff. Additionally, FMC Butner has five confirmed active cases among inmates and three confirmed active cases among staff, while FCI Butner Medium I has 53 confirmed active cases among inmates and five confirmed active cases among staff. All told, eight inmates have died of COVID-19 at the Butner Federal Correctional Complex as of May 19, 2020. Chip Alexander, *Eighth Butner Federal Prison Inmate Dies From the Coronavirus*, THE NEWS & OBSERVER (May 19, 2020), https://www.newsobserver .com/news/local/article242837511.html.

People of all ages are susceptible to COVID-19; however, the elderly and people with underlying health problems are particularly at risk for complications and hospitalizations. Tyler Sonnemaker, *More Than 70% of Americans Hospitalized With COVID-19 Had at Least 1 Underlying Health Condition, the CDC Says—Here's the Breakdown*, BUSINESS INSIDER (March 31, 2020), https://www.businessinsider.com/us-coronavirus-hospitalizations-underlying-health-conditions-cdc-2020-3. According to the Centers for Disease Control and Prevention ("CDC"), "[a]mong US patients hospitalized with COVID-19, 73% had at least one underlying condition." *Id.* "The most frequently reported preexisting conditions among US coronavirus patients were diabetes, chronic lung disease, and cardiovascular disease." *Id.* Additionally, "[t]he Chinese Center for Disease Control and Prevention found that death rates among patients with heart disease, diabetes, chronic respiratory disease, high blood pressure, and cancer were significantly higher than the nationwide average, while Italy's National Institute of Health found that 99% of people who died from COVID-19 had at least one preexisting condition." *Id.* The CDC recommends that individuals with underlying health conditions should follow strategies such as "social distancing" and handwashing in order to help slow the spread of COVID-19. *Id.*

The Court further acknowledges that Defendant has the proverbial perfect storm of preexisting conditions that would make him vulnerable to severe complications if infected with COVID-19. He suffers from hypertension, high cholesterol, diabetes, and COPD in addition to being of relatively advanced age, clinically obese, and in poor overall health. The Court is particularly concerned with Defendant's COPD. A recent review and meta-analysis conducted by scholars affiliated with the Institute for Global Health at the University College London and Public Health Departments in various London Boroughs determined that "COPD was the most strongly predictive comorbidity for both severe disease and ICU admission" among COVID-19 patients. *See* Jain V, Yuan J-M, *Systematic Review and Meta-Analysis of Predictive Symptoms and Comorbidities for Severe COVID-19 Infection,* MEDRXIV (March 16, 2020), https://www.medrxiv. org/content/10.1101/ 2020.03.15.20035360v1 (internal statistics omitted). Even more disturbing is a recent University of Manchester study, which determined that "[o]verweight COPD patients have more of the receptor, or entry point, required for coronavirus infection, in their lungs. This means these patients may be at a greater risk of developing COVID-19 due to increased opportunities for infection." University of Manchester, *Overweight COPD Patients May be at Greater Risk from COVID-19*, MEDICALXPRESS (May 20, 2020), https://medicalxpress.com/news/ 2020-05-overweight-copd-patients-greater-covid-.html.

Numerous other district courts have granted compassionate release motions under similar circumstances. *See United States v. McCarthy*, No. 3:92-cr-0070 (JCH), 2020 WL 1698732, at *5 D. Conn. April 8, 2020) (releasing a defendant who is 65-years-old and suffers from COPD, asthma, and other lung-related ailments because "they substantially increase his risk of severe illness if he contracts COVID-19"); *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *1 (S.D.N.Y. April 3, 2020) (modifying a term of imprisonment by replacing it with

a period of home incarceration because the defendant is 75-years-old and suffers from diabetes, hypertension, and obesity); *United States v. Gonzalez*, No. 2:18-cr-0232-TOR-15, 2020 WL 1536155, at *2 (E.D. Wash. March 31, 2020) (granting a motion for reduction of sentence filed by a 64-year-old defendant with COPD and emphysema).   The common thread among these district court orders is that a sentence reduction is justified only when a defendant is of relatively advanced age and suffers from serious preexisting conditions.   The Court emphasizes that it will scrupulously examine future requests for compassionate release and will only grant such requests in extraordinary and compelling cases.

Many, if not most, federal inmates have health conditions, including asthma, high blood pressure, high cholesterol, or obesity.   By way of example, the United States Department of Justice, Bureau of Justice Statistics issued a Special Report[8] in February 2015, which stated: "In 2011–12, half of state and federal prisoners and local jail inmates reported ever having a chronic condition."   This Special Report contains numerous statistics that indicate that the prevalence of chronic conditions and infectious diseases is significantly higher in state and federal prisoners compared to the general United States population.   High blood pressure was the most commonly reported condition among these inmates.

Defendant has submitted the Affidavit of Brie Williams, M.D., which states that "[a]n estimated 39–43% of all prisoners, and over 70% of older prisoners, have at least one chronic condition, some of the most common of which are diabetes, hypertension, and heart problems."   ECF No. 82-2 at 4.   However, Dr. Williams' Affidavit was written "in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidance."   *Id.* at 2.   There is no evidence that Dr. Williams

---

[8] https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

has ever met Defendant or reviewed any of his medical records; instead, her Affidavit is transparent advocacy for the mass release of inmates. While that may be a valid medical, public health, or epidemiological perspective on corrections in the era of COVID-19, the Court affords the Affidavit no weight in its consideration of Defendant's case.

Indeed, it would be dangerous for district courts to release inmates en masse based solely on the existence of a common chronic condition. After all, the inmates are in federal prison for a reason, and each inmates' sentencing judge considered many factors, including danger to the community and medical conditions, when initially imposing these sentences. Nonetheless, in light of the unprecedented COVID-19 pandemic, compassionate release is a necessary tool in a district judge's toolbox; however, district courts must use this tool judiciously, lest they demolish the foundation upon which the federal criminal justice system rests.

While the Court must acknowledge that the BOP is taking proactive measures to prevent the spread of COVID-19 among inmates at Butner and other facilities, there will likely be many more inmates and staff infected as well as more deaths. Public health organizations, political leaders, and medical experts have cautioned the American people with preexisting condition that they should wear masks, frequently wash their hands, and be scrupulous about social distancing. Those measures are simply not feasible in most custodial settings. For that reason, the Court strongly encourages the BOP to proactively seek release for inmates who present "extraordinary and compelling reasons." Doing so will preserve much needed correctional and judicial resources. It will also save lives.

The Court again emphasizes that potential exposure to COVID-19 alone is not a basis for a reduced sentence. Similarly, the existence of one or more preexisting conditions also does not necessarily provide a basis for a reduced sentence. The Court has an obligation to analyze each

defendant on a case-by-case basis.  Critically, the Court must also analyze each defendant's potential reduced sentence through the lens of the Section 3553(a) factors.  As detailed below, while Defendant's health conditions clearly constitute extraordinary and compelling reasons for consideration of a reduced sentence, the analysis under Section 3553(a) presents a very close question.  Prior to addressing those factors, the Court turns to the Government's argument that the Policy Statement precludes release.

### III. Policy Statements

The Government argues, at length, that Defendant has not made a sufficient showing of extraordinary and compelling reasons under the Policy Statement.  However, as detailed above in the legal standard section of this Order, the Policy Statement applies by its plain terms only to motions filed by the Director of the BOP.  Indeed, the "Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted, nor has it adopted a new policy statement applicable to motions filed by defendants." *Beck*, 425 F. Supp. 3d at 579 (internal citation omitted).  The Sentencing Commission "consists of seven voting members and requires four for a quorum to amend the guidelines." *Id.* at 579 n.7.  Despite the enormous impact of the First Step Act on federal sentencing, the Sentencing Commission only has two voting members. *Id.*  "As the Sentencing Commission lacks a quorum to amend the U.S. Sentencing Guidelines, it seems unlikely there will be a policy statement applicable to motions brought by defendants in the near future." *Id.*

Despite the lack of any guidance from the Sentencing Commission, the Court is nonetheless guided by the general precepts of the Policy Statement.  However, the Court finds that the discussion of the 3553(a) factors below addresses all of the concerns outlined in the Policy Statement.  Accordingly, the Court rejects the Government's argument that Defendant's

inability to meet the specific medical criteria in the Policy Statement forms an independent basis for denying Defendant's Motion.[9]  Congress could have fashioned a statute that required district courts to review BOP's decision under an abuse of discretion or arbitrary and capricious standard; however, it did not do that.  Instead, it vested district courts with the discretion to determine whether extraordinary and compelling reasons justify a sentence reduction.  In so doing, Congress placed an inherent check and balance in the statute by directing district courts to apply the familiar Section 3553(a) factors prior to imposing a reduced sentence.

## IV. Section 3553(a) Factors

At Defendant's sentencing, the Court considered each of the Section 3553(a) factors and determined that Defendant's conduct warranted a custodial sentence.  In determining whether a reduced sentence is appropriate, the Court must again undertake such an analysis to determine that Defendant's sentence is "sufficient, but not greater than necessary," to achieve the goals of sentencing.  This case presents a very close question in light of the severity and scope of Defendant's criminal conduct.

---

[9] The Court notes, however, that the Policy Statement contains an "Other Reasons" provision in the Application Notes that would apply in light of Defendant's numerous preexisting conditions.  *See* U.S.S.G. § 1B1.13(2) App. Note 1(D).

16

1. **Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

This case involves the most egregious violations of non-violent federal firearm offenses that the undersigned has witnessed during his time on the bench.  Defendant characterizes his criminal conduct as "simply possession of a firearm by a convicted felon."  This absurd characterization of Defendant's conduct is squarely at odds with the facts.  As detailed above, local law enforcement served a search warrant at Defendant's home due to reports of stolen goods being in plain view at his home.  Many of these stolen goods were the exact type of items Defendant was convicted for stealing nearly thirty years ago.  During a search of Defendant's home, officers seized twenty-four firearms and determined that five of the firearms were stolen. During questioning, Defendant admitted to purchasing one of the stolen firearms from a <u>juvenile</u>. Moreover, Defendant was brazen about his criminal conduct, as he had numerous stolen goods in plain view at his house.  Incredibly, Defendant even purchased a firearm from a law enforcement officer with full knowledge that he was prohibited from owning a firearm.  In short, the nature and circumstances of Defendant's offense and his history and characteristics militate in favor of serving his full term of imprisonment.

2. **Seriousness of the Offense, Respect for the Law, Just Punishment, and Deterrence**

The seriousness of Defendant's offense cannot be understated.  Defendant encouraged individuals, knowingly or unknowingly, to commit thefts by engaging in the receipt of stolen goods and firearms.  He also contributed to the delinquency of a minor by purchasing a stolen firearm from a juvenile, and he endangered the career of a law enforcement officer by purchasing a firearm without disclosing his status as a felon.  Apparently, Defendant's ten-year sentence in 1992 did not dissuade him from associating himself with people involved in serious

property crimes, perhaps because he served less than twenty-one months in custody. One of the primary purposes of the Court's twenty-five-month sentence was to deter Defendant from future criminal activity. The Court is of the firm opinion that a custodial sentence is necessary to deter Defendant from future criminal conduct; therefore, this factor also preponderates in favor of Defendant serving his remaining term of imprisonment. However, as discussed below, the Court intends to fashion a sentence that will serve to deter Defendant from committing any future criminal activity.

### 3. Protection of the Public

While Defendant's conduct was not inherently violent, it involved the possession of a veritable arsenal of firearms, some of which were stolen from peoples' homes. For obvious reasons, there is a correlation between the theft of firearms and violence. There is no evidence that Defendant participated in any of the burglaries of the stolen firearms or other stolen goods; however, by purchasing or otherwise receiving stolen items, Defendant tacitly encouraged others to commit burglaries from peoples' homes. There is perhaps no more intimate non-violent offense than a home burglary. The Court must acknowledge, however, that Defendant does not have a history of violence and was not convicted of any criminal conduct for nearly thirty years prior to the instant offense. On balance, the Court finds that this factor has a neutral effect on the question of whether to grant a reduced sentence.

### 4. Provision of Medical Care or other Training or Treatment

Under the unique circumstances of this case, the Court finds that the need to provide medical care is a factor to be heavily weighed in its analysis. It is undisputed that Defendant suffers from a variety of chronic maladies. Throughout his briefing, he takes issue with the medical care he received in his (limited) pretrial custody and while at the BOP, going so far as to

insinuate that the facilities were negligent in their medical treatment.  The Court has not been presented with sufficient evidence to make a determination as to the quality of medical care Defendant has received while in custody, nor is the Court persuaded by Defendants repeated complaints about not receiving opioid pain medications, muscle relaxers, and/or benzodiazepines in his desired dosages while at the BOP.  However, the Court must acknowledge the severity of the COVID-19 problem at FCI Butner Low.

The number of positive cases among inmates and staff continues to climb at all of the BOP facilities at Butner.  This directly endangers Defendant's health; however, it also stifles the opportunity for Defendant to receive prompt and adequate treatment for his medical conditions. Without question, the medical staff FCI Butner Low is consumed with containing and treating the spread of COVID-19.  This makes it far more difficult for inmates with chronic health conditions to seek routine follow-up care and undergo necessary diagnostic screenings for potential acute medical problems.  For example, Defendant contends that one of his doctors discovered an 8 mm spot on his lung prior to incarceration when he was diagnosed with COPD. ECF No. 85 at 6–7.  Defendant claims he has made "repeated requests over the past 6-months (sic) to see a pulmonologist in prison, so that he could have his lungs re-scanned." *Id.* at 7.

In light of the complications that would almost certainly arise from a COVID-19 infection, and the limitations on medical care Defendant faces during the pandemic, the Court finds that this factor weighs heavily in favor of a reduced sentence.

### 5.  Unwarranted Sentencing Disparities

The issue of unwarranted sentencing disparities has troubled the Court in this case.  The Court very frequently presides over felon in possession cases.  The typical case involves a young male without significant financial means who is arrested with a small quantity of drugs and a

firearm during a traffic stop.  Very frequently, those defendants receive sentences in excess of twenty-five months.  Most of the time, these heightened sentences are driven primarily by the defendant's criminal history, which is often close in time to the federal firearms charge(s).  But this begs the question: What is worse—a defendant with a recent felony conviction in possession of one firearm or a defendant with ten older felony convictions in possession of twenty-four firearms, five of which are stolen?  The Court need not answer this question today; however, but for Defendant's serious medical conditions, the Court would have varied upwards in Defendant's case and imposed a much more significant term of imprisonment.  In fact, this is the only case in which this Court has informed the parties that it was considering an upward variance to date.

Defendant is fortunate to have access to legal, family, and medical resources that enable him to present a compelling case for early release.  Many inmates do not have these resources.  It is critical that district courts give full consideration to all motions for compassionate release and be mindful of the lack of resources available to many federal inmates.  Law must be applied uniformly, and the BOP must be mindful of its obligation to apply the criteria in the Policy Statement fairly to all inmates, not just those high-profile inmates who can afford a bullpen of legal and medical experts.  Of course, all inmates have a very high bar to meet in proving that early release is warranted, and this Court will summarily dismiss any motion that is based solely on a fear of COVID-19 infection.  But, ultimately, the BOP is in the best position to evaluate an inmates' health conditions, risk of infection and complications, and dangerousness.  It should be an exceedingly rare occasion where this Court has to grant a motion brought by an inmate.

### 6.  Kinds of Sentences Available and Terms of Reduced Sentence

After evaluating the 3553(a) factors, the Court finds that there are viable sentencing alternatives to Defendant finishing his custodial sentence at FCI Butner Low.  The Court is

reluctant to modify Defendant's sentence, as he has already been spared years of time in federal prison due to his medical conditions.  His criminal conduct was egregious and showed a blatant disrespect of the law; however, this Court cannot sit idly by and watch while COVID-19 destroys elderly and seriously infirm inmates in BOP custody.  Accordingly, the Court rules as follows:

1.  Defendant's sentence is reduced to time served.

2.  Defendant's previously imposed term of three years of supervised release is modified to include the following conditions, as well as the conditions outlined in the Court's previous Judgment:

    a.  Defendant will be placed on home incarceration and location monitoring utilizing Global Positioning Satellite technology for the first 18 months of his term of supervised release.  Defendant shall immediately report to the USPO so that he may begin his supervision.

    b.  Defendant must self-quarantine for the first 14 days after his release from prison and should minimize all contact with family members and visitors to his home.

    c.  During the period of home incarceration, Defendant will not be permitted to leave his home for any reason other than scheduled doctors' appointments.  Defendant is directed to provide the USPO with the date, time, and location of his doctors' appointments at least 14 days prior to the appointment absent a medical emergency.

    d.  Defendant will not be permitted to work, go to the store, go to church, attend social events, or otherwise leave his home for <u>any reason</u> during the period of home incarceration.

        i. The Court recognizes that Defendant has filed a lawsuit related to his pretrial detention in the Darlington County Detention Center. *See Griggs v. Hartsville Med. Enrichment Servs., LLC*, No. 2019-CP-16-00674 (Darlington Cnty. Ct. of Common Pleas). Defendant's counsel assumed that litigation with the knowledge that Defendant would likely be serving a federal prison sentence. In light of the substantial sentence reduction Defendant is receiving and the need for home incarceration to serve as a functional alternative to custodial incarceration, Defendant will not be permitted to leave his home to meet with his legal counsel. In the event Defendant has a court hearing or deposition in this case

or any other litigation, Defendant must notify the USPO and provide supporting documentation showing the date, time, and location of the hearing or deposition at least 14 days prior to the hearing or deposition.

    ii.    The Court further recognizes that this will put a strain on Defendant's family; however, Defendant's wife submitted an Affidavit that stated she "would be more than willing to have [Defendant] back in [her] home even if that consists of home confinement." Defendant is reminded that the restrictions in this Order are a result of his own criminal conduct and are the only means by which the Court can ensure that an alternative sentence will achieve the necessary goals of sentencing.

**e.** The Court will not consider <u>any</u> motion for early termination of home incarceration or supervised release unless there is a substantial change in circumstances warranting extraordinary relief.

**f.** The Court strongly discourages Defendant from filing any motions seeking leave to temporarily lift the conditions of home incarceration so that he may attend any events in the community, as the Court will summarily deny such motions absent extraordinary circumstances.

**g.** The USPO is directed to ensure that there are no firearms in Defendant's home prior to Defendant residing in his home.

**h.** Any violations of the terms of this Order will result in Defendant IMMEDIATELY being taken into custody.

**3.** Each of Defendant's attorneys of record are directed to discuss the terms of this Order with Defendant within 48 hours of his release from custody. Each attorney is directed to then file an Affidavit or Declaration with the Court stating that he/she has explained the terms of this Order to Defendant.

**4.** A copy of this Order shall be provided to the USPO and the BOP immediately so as to enable Defendant's immediate release.

## CONCLUSION

For these reasons, Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), ECF No. 82, is **GRANTED**, subject to the conditions set forth above.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.

United States District Judge

May 22, 2020
Spartanburg, South Carolina